# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 38864**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Leon A. BROWN IV**
Captain (O-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 6 July 2017

————————————

*Military Judge:* Natalie D. Richardson.

*Approved sentence:* Dismissal, confinement for 25 years, and forfeiture of all pay and allowances. Sentence adjudged 8 December 2014 by GCM convened at Minot Air Force Base, North Dakota.

*For Appellant:* Major Mark C. Bruegger, USAF; Major Jeffrey A. Davis, USAF; Frank J. Spinner, Esquire.

*For Appellee:* Major Tyler B. Musselman, USAF; Major Mary Ellen Payne, USAF; Major J. Ronald Steelman III, USAF; Major Meredith L. Steer, USAF; Gerald R. Bruce, Esquire.

Before MAYBERRY, JOHNSON, and SPERANZA, *Appellate Military Judges.*

Judge SPERANZA delivered the opinion of the court, in which Senior Judges MAYBERRY and JOHNSON joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

SPERANZA, Judge:

A military judge, sitting as a general court-martial, convicted Appellant, contrary to his pleas, of providing alcohol to minors on divers occasions; wrongfully distributing marijuana on divers occasions; wrongfully distributing psilocybin (mushrooms) on divers occasions; wrongfully using mushrooms on divers occasions; sexually assaulting a child, GB;[1] behaving in a disgraceful and dishonorable manner that seriously compromised his standing as an officer by wrongfully and dishonorably organizing individuals into a violent gang; wrongfully communicating a threat to AL on divers occasions; wrongfully communicating to MH a threat to injure ME by paying someone to assault ME; receiving consideration for arranging for KW, PW, WK, and other unnamed persons to engage in sexual intercourse with others; unlawfully entering ML's house; sexually assaulting a child, FT;[2] wrongfully threatening to hurt, injure, or kill Captain (Capt) CM; wrongfully threatening to hurt, injure, or kill Special Agent (SA) JG; and wrongfully threatening to hurt, injure, or kill Airman Basic (AB) JS, in violation of Articles 92, 112a, 120b, 133, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 912a, 920b, 933, 934.[3] The military judge sentenced Appellant to a dismissal, confinement for 25 years, and forfeiture of all pay and allowances. The military

---

[1] The military judge found Appellant not guilty pursuant to Rule for Courts-Martial (R.C.M.) 917 of raping GB in violation of Article 120b,UCMJ, 10 U.S.C. § 920b, but convicted Appellant of the lesser-included offense of sexual assault, also in violation of Article 120b, UCMJ.

[2] The military judge found Appellant not guilty pursuant to R.C.M. 917 of raping FT in violation of Article 120b, UCMJ, but convicted Appellant of the lesser-included offense of sexual assault, also in violation of Article 120b, UCMJ.

[3] The military judge acquitted Appellant of conspiracy to pander; distribution of methamphetamine; distribution of heroin; distribution of Vicodin; distribution of ecstasy; distribution of lysergic acid diethylamide (LSD); sexual assault of KW by administering KW a drug or intoxicant; sexual assault of KW by encouraging an unknown individual to commit a sexual act upon KW by administering KW a drug or intoxicant; conduct unbecoming an officer for organizing individuals under the age of 18 years to have sex for hire; obstruction of justice by requesting Airman Basic (AB) JS have others give AL marijuana or cash if she refused to testify or "have others beat her up or kill her if she refused the offer"; obstruction of justice by requesting AB ET have others give AL marijuana or cash if she refused to testify or "have others beat her up or kill her if she refused the offer"; and communicating a threat to hurt, injure, or kill AB JS. The military judge granted the Defense's motion for a finding of not guilty pursuant to R.C.M. 917 and found Appellant not guilty of raping FT. Appellant was also found guilty by several exceptions and substitutions.

judge credited Appellant with 60 days of pretrial confinement credit. The convening authority approved the adjudged sentence.

On appeal, Appellant argues that all of his convictions, except his provision of alcohol to minors, distribution of marijuana, mushroom use, and threats to AL, are legally and factually insufficient.[4] Appellant also claims the Government failed to meet its discovery obligations;[5] he was deprived his constitutional right to effective assistance of counsel at trial;[6] the military judge erred in not granting additional sentencing credit for pretrial punishment Appellant suffered during a search of his pretrial confinement sleeping quarters; and post-trial delays in his case warrant meaningful relief.

We find there is insufficient evidence to support Appellant's conviction of unlawful entry. We also find that Appellant was subjected to pretrial punishment in violation of Article 13, UCMJ, 10 U.S.C. § 813, and is, therefore, entitled to additional, modest confinement credit. We find no other prejudicial error, affirm the remaining findings, and reassess the sentence below.

## I. BACKGROUND

Appellant and at least one other local civilian criminal decided to form a "Crips" gang in Minot, North Dakota. Appellant—referred to by the gang members and their associates as "Captain"—became the self-proclaimed leader, or "OG," of this gang, whose criminal enterprise tended to revolve around local teenage girls.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant essentially maintains that most of his convictions were obtained through the testimony of unbelievable witnesses and the judge's misinterpretation of the evidence, to include his recorded pretrial confinement conversations. However, the law, and indeed the facts of this case, cause us to decline Appellant's claims and find all but one of his convictions legally and factually sufficient for the reasons discussed below.

---

[4] The legal and factual sufficiency of Appellant's distribution of mushrooms on divers occasions is raised pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982).

[5] Raised pursuant to *Grostefon,* 12 M.J. 431.

[6] Raised pursuant to *Grostefon,* 12 M.J. 431.

We have a statutory mandate to "conduct a de novo review of both the legal and factual sufficiency of a conviction." *United States v. Walters*, 58 M.J. 391, 395 (C.A.A.F. 2003).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). The "reasonable doubt" standard does not require that the evidence be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001). The question, therefore, is whether "a reasonable factfinder reading the evidence one way could have found all the elements of the offense beyond a reasonable doubt." *United States v. Gutierrez*, 73 M.J. 172, 175 (C.A.A.F. 2014) (quoting *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011)).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325; *see also United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *United States v. Washington*, 57 M.J. 394, 399.

**1. Sexual Assault of GB**

The military judge convicted Appellant of sexual assault of a child for penetrating GB's vulva with his penis when, at the time, GB was only 15 years old. Appellant committed this offense during a multi-day party he hosted—the "Project X" party. GB went to this party with her teenage friends, KW and KH. Another teenage girl, AL, met GB at the party. GB, KH, KW, and AL testified at trial.

At the time of the party, KW had known Appellant for several months. KW testified that at the party she told Appellant GB's age. KW described walking into Appellant's bedroom and seeing Appellant having sexual intercourse with GB. She recounted Appellant and GB being naked with Appellant on top.

GB explained that she met Appellant at this party when she was 15 years old. At the party, GB got extremely drunk. She remembered only "flashbacks"

of the evening through the next morning. In pertinent part, GB recounted spending time with Appellant in his living room, being on Appellant's bed and picking her bra up off of the bedroom floor, waking up in the morning with her clothes on and nobody else in the bedroom, returning to the downstairs, and "start[ing] the party again."

KH turned 16 years old the same month as the "Project X" party. She too first met Appellant at the party. KH described "hanging out" and "drinking when [Appellant] brought the booze home." KH described GB as "really drunk" and "puking everywhere." KH observed Appellant and GB together on a couch, Appellant telling GB she was "really pretty," Appellant and GB "making out," and the two eventually going upstairs. KH also described seeing GB the next morning in Appellant's bedroom, GB's clothes on the floor, and GB naked except for a bedsheet. Appellant was in the bathroom at the time.

AL met Appellant at the "Project X" party. AL described GB as being "trashed" the first evening of the party. AL also recounted a conversation she had with Appellant the next day during which Appellant admitted to having sex with GB and claimed "he would have got [sic] her pregnant if he hadn't got [sic] the Plan B pill . . . ." Appellant later became GB's boyfriend and exchanged text messages with AL related to his relationship with GB. Appellant's text message communications with AL included the following:

[Appellant:] Did [GB] tell you I got her prego? Lol

[AL:] The night of ur party??

[Appellant:] Another time.

As Appellant notes on appeal, each of these witnesses was thoroughly cross-examined by Appellant's trial defense counsel. Nonetheless, Appellant argues that his conviction of this offense is neither legally nor factually sufficient because "penetration was not proven," "KW lacked credibility," and "KH's testimony is not credible." The military judge determined otherwise, at least with respect to this offense. Considering the evidence in the light most favorable to the prosecution and drawing every reasonable inference from the evidence in favor of the prosecution, we find a reasonable factfinder could have found all the essential elements of this offense beyond a reasonable doubt. Moreover, after weighing the evidence presented at trial regarding Appellant's sexual assault of GB and making allowances for not having observed the witnesses who testified as to this offense, we are convinced beyond a reasonable doubt Appellant sexually assaulted a child, GB, by penetrating GB's vulva with his penis.

**2. Sexual Assault of FT**

The military judge convicted Appellant of sexually assaulting FT, a child who was only 14 years old at the time, by penetrating FT's vulva with his penis, between on or about 1 September 2013 and on or about 30 October 2013. FT did not testify at trial. FT's brother—JP—and KW testified. In addition, JG and AB DE testified about incriminating statements and admissions Appellant made to them while they were confined together during Appellant's pretrial confinement at Minot Air Force Base (AFB), North Dakota. Audio recordings of Appellant's pretrial confinement conversations were also admitted into evidence.

JP testified he met Appellant at a party at Appellant's home approximately one year after the "Project X" party. While at the party, JP recounted overhearing Appellant tell other partygoers that FT "f[***]s like a boss." JP told Appellant that his sister, FT, was only 14 years old. According to JP, Appellant was "shocked and appalled" and told JP that "he thought she was 17."

KW introduced FT to Appellant and told Appellant FT's age—younger than 15 years old at the time. On direct examination, trial counsel asked KW if there was "anything physical between [FT] and [Appellant]." KW testified that, near the end of 2013, she walked into Appellant's bedroom and witnessed Appellant and FT naked on Appellant's bed with Appellant on top of FT having sex with her.

Appellant was in pretrial confinement with JG, a former military member who was then serving post-trial confinement. JG described Appellant's statements about FT as follows:

> Q. Did [Appellant] ever talk about an individual named [FT]?
>
> A. Yes.
>
> Q. What did he say about [FT]?
>
> A. I guess one night they were throwing a party and [FT] came over. They were drinking and she asked [Appellant] and the other people, the other gang members there, what it takes to get into the gang and they told her that they would have to sleep with her to get into the gang. I guess that [Appellant] said her and three, including him, went up to a bedroom and slept with her. I guess [Appellant] went first followed by [one gang member] and then some other guy who I don't know the name of.
>
> Q. That's what [Appellant] told you?
>
> A. Yes.

Q. Did [Appellant] say how old [FT] was?

A. At the time she was 14.

Q. Did [Appellant] say specifically what happened that night with [FT]?

A. Yes.

Q. Okay, what did he say?

A. He said that they had sex, that he went first. [One gang member] went second, and the other guy went third to get her into the gang.

AB DE knew Appellant well before they spent time together in confinement. Apart from describing Appellant's involvement with alcohol, drugs, threats, and GB, AB DE recounted Appellant explaining that KW "would bring girls over to have him sleep with," and "in the military 'of age' is 16, and he doesn't ask their age anyway." AB DE also described comments Appellant made about FT in pretrial confinement. According to AB DE, the confinees were listing people they found attractive and FT's name was listed. Appellant stated. "Oh, [FT] that's the other girl that I got the abortion for." AB DE responded that "She's got to be like 17 or 18." AB DE testified that Appellant then clarified "No, she was 14 at the time." AB DE continued to recount Appellant's discussion of FT that included the following general statements or admissions: FT was *drunk* the *first time* Appellant had sex with her; "the *first time* she was joining the gang so three of the gang members had sex with her; and *the second time* was when [Appellant] got her pregnant." (Emphasis added).

The Air Force Office of Special Investigations (AFOSI) placed a recording device inside the confinement facility to capture Appellant's conversations with the other confinees. In one recording, the confinees joke about Appellant's "Project X" party—"[w]hat do you call a bunch of 15-year-old girls partying at a house? . . . [Appellant's] Project X party." This leads to the following exchange, evidently referring to [FT]:

[Appellant:] I wasn't even sure if it was me that got her pregnant. She got f[****]d by three dudes on the same f[***]in night.

[Confinee:] You must feel responsible if you took her to the abortion clinic.

[Confinee:] Brown, you promote the degradation of our youth.

[Appellant:] I'm doing them a favor.

> [Confinee:] The f[**]k you are. How are you doing a 14-year-old-girl a favor by knocking her up, feeding her drugs, and then taking her to the Red River abortion clinic?
>
> [Confinee:] So, if a 14 year old gets off, if you just happen to be driving by ----
>
> [Appellant:] She said she was f[*****]n 17.

An excerpt of another recording contained the following statement Appellant made about FT:

> When I f[*****]d [FT] I really did not know her age. I really thought she was 17, because she f[*****]d like she was older
>
> . . .
>
> She was getting gang f[****]d. She f[****]d me and then after [one gang member] f[****]d her, and then [another] f[****]d her, and then she was like [inaudible]."
>
> [Another confinee asks Appellant] And she's 15?
>
> [Appellant responds] Yep.

Appellant was originally charged with raping FT, a child, for penetrating her vulva with his penis by using force against her, to wit: holding her down with his arms. After the Government rested its findings case, the Defense moved for finding of not guilty of this specification pursuant to Rule for Courts-Martial (R.C.M.) 917. Trial defense counsel maintained, "On this there has been [no] evidence whatsoever that Captain Brown used force to wit: holding [FT] down with his arms at any point while they were having sex." The Government agreed with the Defense's assessment, with trial counsel stating:

> there was no independent evidence of force because [FT] was not present or testified about that. We do believe there is a lesser included offense. So as to the greater offense of force it is our position that we agree. To the lesser included offense of sexual assault of a child, there is evidence.

Appellant was convicted of this lesser-included offense.

Appellant was originally charged with another specification of raping FT, a child, which alleged Appellant penetrated FT's vulva with his penis by administering to her a drug, intoxicant or other similar substance. After the Government rested its findings case, the Defense moved for a finding of not guilty of this offense pursuant to R.C.M. 917. Again, the Government agreed and the following exchange occurred between the military judge and trial counsel:

> STC: And we agree with defense on [the rape by administering a drug, intoxicant, or other similar substance specification], that there has not been independent evidence of that specification as far as [FT]. There was only one incident talked about by multiple witnesses. The audio disagrees, but there is no independent evidence, so we agree.

> MJ: And that was to all of the entire specification?

> STC: To all of [this specification] because I don't think there is independent evidence of two incidents. There is just one incident.

Accordingly, the military judge granted the defense motion and found Appellant not guilty of raping FT by administering her a drug, intoxicant or other similar substance.

Appellant argues that his conviction of sexually assaulting FT is legally and factually insufficient because "[t]he only potentially credible evidence supporting this specification came from testimony provided by JP, FT's brother, and statements purportedly made by [Appellant], admitting to sexual intercourse with FT." Appellant also argues that his statements evidenced his "belief that FT was 17 years old, not 14 years old as testified to by her brother." Accordingly, Appellant maintains, "There was no credible evidence that [Appellant] knew or believed that FT was 14 years old at the time any alleged sexual acts may have taken place." Appellant also claims, "There is no evidence corroborating penetration." Appellant further explains that JP's "story . . . does not make sense," because "[i]t makes no sense that JP would not confront [Appellant] if this really happened . . . [,] nor did he tell his parents or report it to the police." Finally, Appellant reasons that "[t]o the extent the government relies on any testimony by KW regarding sexual acts between [Appellant] and FT, KW's credibility has been sufficiently challenged . . . ."

While we acknowledge the military judge acquitted Appellant of several charges to which KW was the primary—if not the only—witness, we are nonetheless mindful that the military judge "may believe one part of a witness' testimony and disbelieve another." *United States v. Harris*, 8 M.J. 52, 59 (C.M.A. 1979). Accordingly, Appellant's view that the military judge's findings necessarily render KW's entire testimony unbelievable is misplaced. Indeed, after considering the evidence and all reasonable inference in a light most favorable the prosecution, we find that the military judge—a rational factfinder presumed to know the law—could have found beyond a reasonable doubt that Appellant was not either subjectively or objectively mistaken about FT's age and penetrated FT's vulva with his penis. Additionally, after

weighing the evidence presented at trial regarding Appellant's sexual assault of FT and making allowances for not having observed the witnesses who testified as to this offense, we are convinced beyond a reasonable doubt Appellant sexually assaulted a child, FT, by penetrating FT's vulva with his penis.

### 3. Organizing a Violent Gang

The military judge convicted Appellant of the following offense, in violation of Article 133, UCMJ:

> [Appellant did] behave in a manner that disgraced and dishonored [Appellant] and seriously compromised his standing as a commissioned officer by wrongfully and dishonorably organizing individuals into a violent gang, to the disgrace of the armed forces.

Appellant, along with his gang member associates, dressed in their gang color, blue. Blue clothing and blue bandanas were found at Appellant's residence along with a picture on Appellant's wall that read "Crips for Life" next to his name "Leon." Multiple, if not all, witnesses testified, in some respect, about Appellant's gang-related activities, as well as his leadership role within the "Crips" gang. Indeed, Appellant's own statements confirmed his role within the gang and detailed his participation in its activities.

Accordingly, the evidence presented at trial caused Appellant on appeal to "concede[] that the evidence demonstrates multiple claims by friends and other inmates that [Appellant] was involved in 'gang' activity." However, Appellant claims that the "challenge" for us "is determining whether [Appellant] was engaged in hyperbole and bravado while hanging out with under-aged females and others, whether friends or fellow inmates, that he was trying to impress." Appellant also asserts that "there was no credible evidence of any 'violent' activity as alleged." In support of his argument, Appellant once again attacks the credibility of witnesses and maintains that his incriminating statements were merely "hyperbole and fiction to impress other inmates."

After considering the evidence of this offense and all reasonable inferences in a light most favorable to the prosecution, finding Appellant's conviction of wrongfully and dishonorably organizing a violent gang legally sufficient is not a particularly difficult challenge. Appellant fancied himself the leader of a criminal enterprise and, at times, exaggerated his and his gang's exploits while trying to "impress" his fellow inmates, who were all enlisted members. Appellant's statements, as described by witnesses, included his boast that his gang called him "OG, King Cold" and that he directed all of the gang's activities. Appellant also explained that in order to join the gang, males had to get beaten up by the gang members and females had to have sexual intercourse with three gang members. Appellant also admitted that

his gang would "rob people, break into schools, [and] they broke [KW]'s window." Appellant's claims were corroborated by testimony describing threats and destruction of property. The military judge, as a reasonable factfinder, could have found beyond a reasonable doubt that Appellant organized a violent gang. Moreover, we are convinced beyond a reasonable doubt that Appellant organized this so-called "Crips" gang, he was the unquestioned leader of the gang, his gang was violent, and that he is guilty of this Article 133 offense.

**4. Prostitution Ring**

The military judge convicted Appellant of the following offense, in violation of Article 134, UCMJ:

> [Appellant did] wrongfully receive valuable consideration, to wit: money, on account of arranging for K.W., P.W., W.K., and other unnamed persons to engage in acts of sexual intercourse with unnamed persons, which conduct, under the circumstances, was of a nature to bring discredit upon the armed forces.

Appellant described his gang's main activities as "drugs, prostitution, [and] burglary," according to JG. With regard to the "prostitution ring," JG testified, on direct examination from trial counsel:

> Q. Did he talk about what his involvement would be with the drugs and prostitution? What would be his involvement with that?
>
> A. He would basically just run things behind the scenes. He would let his gang members actually deal hands-on.
>
> Q. Did he talk about whether he made the decisions?
>
> A. Yes, he said that anything that goes on in his gang is run through him first.
>
> . . . .
>
> Q. Did you hear anything about prostitution?
>
> A. Yes, they had a prostitution ring, and they had girls ranging in ages from 15 to 21. The younger girls would bring in. . . They would charge more for the younger girls. It was kind of run with him and a girl called [WK], who goes by Nona. She kind of headed that up. I am not sure how they recruited the girls or anything like that.
>
> . . . .

Q. Did he talk about what the money exchange would be for the prostitution?

A. Like $300.00 to $800.00.

Q. Sorry?

A. $300.00 to $800.00. The younger girls would bring in more money, so they would get charged more.

JG testified during cross-examination that Appellant indicated that he received a 70 percent cut on all money the gang received from prostitution. Further, AB DE testified that Appellant stated that "they ran a prostitution ring, that people would come over to his house and there was girls named Nona and Kiki who were the prostitutes and possibly [KW]; and guys would pay him to sleep with them."

In addition, KW testified about witnessing people pay Appellant to have sex with her and on another occasion TW. KH testified about WK's role as a prostitute in Appellant's gang and how Appellant provided WK money "like it was a job . . . ." TS testified that WK was a member of Appellant's gang. TS also described on direct examination how Appellant's, and the gang's, second-in-charge, CM, approached her about a "prostitution ring:"

Q. What was approached to you about this prostitution ring?

A. Just being the head person, like the head girl in the house.

Q. What would be your responsibilities for being the head girl in the house?

A. Make sure that they brought the money back to him, and make sure that they were actually doing what they were told to.

Q. Did you agree to that?

A. No, sir.

The prosecution also presented an audio recording of the following conversation between Appellant and another confinee, AB JS:[7]

[AB JS:] Were you running prostitution?

---

[7] While discussing this conversation in his Reply Brief to the Government Answer to Court Order, dated 5 May 2017, Appellant states "Given the timing, it is unclear what Appellant is referencing; admittedly, it could indeed be that he had run his own prostitution ring."

[Appellant:] What?

[AB JS:] Were you dealing with prostitution?

[Appellant:] Oh yeah, I guess some girl's angry dad knew and f[****]n went to OSI.

[AB JS:] I heard—I heard that's pretty big up here.

[Appellant:] Yeah it is; also one of those, um, one of those grain silos, they were running a ring inside one of them and the cops busted it.

[Banter by several individuals at once.]

[Appellant:] S[**]t, I had girls from 16 to 21.

[AB JS:] Yeah?

[Appellant:] Yeah.

In challenging the legal and factually sufficiency of this conviction, "[Appellant] does not dispute that multiple witnesses testified about his purported involvement in gang activity. The dispute is that there was no credible evidence of violence [sic] or that, as argued below, his alleged involvement was anything more than empty boasting." Appellant maintains there is "absolutely no credible evidence whatsoever of any prostitution activity or of any 'money exchange'. . . .[T]here is no money, no arrests, and no name of the alleged 'John' in [the PW] incident." Most importantly to Appellant, PW did not testify. In addition, Appellant again argues "KW's testimony has already been discredited by the military judge's findings with respect to her claims." Appellant furthers his argument by citing his acquittal of conspiracy to engage in pandering and challenging the credibility of witnesses.

Once again, we view the evidence of this offense and all reasonable inference in a light most favorable to the prosecution. Once again, we find Appellant's conviction legally sufficient. The military judge in this case could reasonably have found Appellant's admissions to be corroborated by witness testimony. The military judge could have properly believed some portions of the witnesses' testimony and not others. Accordingly, the military judge as factfinder could have reasonably found beyond a reasonable doubt that Appellant was arranging for KW, PW, WK, and others to have sex with people who paid him money and that such conduct was of a nature to bring discredit upon the armed forces. Moreover, we a convinced beyond a reasonable doubt that Appellant is guilty of arranging a service-discrediting "prostitution ring."

### 5. Communicating Threats

The military judge convicted Appellant of threatening to injure ME by paying someone to assault ME and threatening to hurt, injure, or kill Capt CM and SA JG.

ME was one of Appellant's roommates. AL testified that she heard Appellant say "he had a hit out or he wanted to like get a hit out for [ME]" because Appellant thought ME had called law enforcement on him. Senior Airman (SrA) MH, who was Appellant's friend, overheard Appellant "saying that he was looking to find or pay someone to beat [ME] up." MB, who was confined with Appellant, recounted Appellant making statements about ME:

> He didn't say whether—I can't remember whether [ME] owed him money or somebody said that that he put out a bounty on [ME] because [Appellant] wanted to get it taken care of, but whatever the situation happened between those two, [Appellant] put a bounty out and the guy ended up getting in a fight or got beat up. But he didn't know who did it, so it was never paid out, so it kind of just happened.

AB DE further testified, "[Appellant] had offered me, [Appellant] came to my house and offered me; [Appellant] said 'I'll give you $5,000 to anyone that hurts [ME] or puts him in the hospital." Appellant was also recorded in confinement telling AB DE, "Him, her and [ME], remember that f[****]r I offered $5,000.00 . . . ."

While in pretrial confinement, Appellant also made a variety of threats against one of the prosecutors, Capt CM, and one of the investigators, SA JG, that were communicated to, or overheard by fellow inmates, JG, MB, and AB DE. Although JG characterized Appellant as "venting," Appellant was recorded in pretrial confinement surmising, "I think communicating a threat is my biggest problem."

On appeal and consistent with his realization in pretrial confinement, Appellant concludes, "It must be conceded that the evidence demonstrates multiple statements which support the government's arguments that [Appellant] made threats about others." Nevertheless, Appellant maintains that somebody else threatened ME and that his threats against Capt CM and SA JG were made "in jest."

Appellant's convictions of threatening ME, Capt CM, and SA JG are legally sufficient. After viewing the evidence of these convictions in a light most favorable to the prosecution, we reach the conclusion that a rational factfinder could have found the essential elements of communicating a threat beyond a reasonable doubt. We also find Appellant's convictions factually sufficient,

as we are convinced beyond a reasonable doubt that Appellant communicated threats against ME, Capt CM, and SA JG.

### 6. Unlawfully Entering ML's Home

The military judge convicted Appellant of unlawfully entering ML's dwelling in December 2013.

Appellant maintained a relationship with AL, during which time he gave her his social security card, blank checks, birth certificate, and car keys. Appellant also bought AL a ring, "pipes," and "bongs." ML is AL's mother. AL lived with ML in Berthold, North Dakota. Appellant would pick AL up from her home. AL eventually ended the relationship causing Appellant to request AL return his "stuff." AL blocked Appellant's phone number on her phone, which prevented her from receiving text messages directly from Appellant's phone number.

ML and AL testified about AL's relationship with Appellant, ML returning some of Appellant's items to him, and threatening messages AL received in October 2013 after the relationship ended. AL received these text messages on her mobile phone through "TextNow.com":

> Give me my stuff back please
>
> I'm trying to be nice
>
> If you Dont [sic] you have no idea.......test me
>
> Nobody will ever give u [sh*t] until I get my stuff back I promise you… I will use every resource I have ever
>
> I HATE you
>
> OK its war b[***]h
>
> . . . .
>
> Are you gonna bring my things please?
>
> . . . .
>
> well when u do plz get me all my stuff back please including the ring thanks
>
> (1/3) If you Dont [sic] give me my things including the ring by TOMORROW I promise some girls will go to you and get it and they will kick your
>
> (2/3) ass.. its been arranged already and you know I have the influence to make it happen…good luck using another guy for weed again
>
> (3/3) half the town knows how u f[***]ed me over

15

During trial, particularly when the prosecution laid the evidentiary foundation for admission of the text messages, inconsistencies arose as to when ML returned items to Appellant. ML testified that she personally returned items to Appellant before AL received the aforementioned text messages. AL initially testified on direct examination as follows:

Q. [AL], did your mom ever give anything back to [Appellant], that's the next step you mentioned?

A. Yeah, she gave it all back.

Q. Do you remember when that was?

A. I am not sure.

Q. Was it before or after these text messages, or during these text messages?

A. It was after I got them, because I showed her them.

Q. So you showed your mom the text messages?

A. Yeah.

Q. Is that what prompted the stuff being returned?

A. Yeah.

The Defense identified this conflict and objected, but the military judge admitted the exhibit containing the text messages.

AL testified on cross-examination, in pertinent part, as follows:

Q. All right, now, if I understand, after that you at some point made arrangements with your mom to return property to him, correct?

A. Yeah.

Q. Why wasn't that done, if you knew you were going to be breaking up with [Appellant] why was that not done at the time you broke up with him?

A. Honestly, I forgot I even had it. It was a bag downstairs, like I didn't really like look at it every day. It just kind of didn't cross my mind.

Q. How did you end up coming across it, or how did your mom come across it?

A. I guess, from what I remember, the text of him saying "I want my stuff back."

Q. So after you get the text "I want my stuff back" then you were thinking about it and you went to find the stuff, correct?

A. Yeah.

Q. And the same day you get the te[x]t that "I want my stuff back" did you return the stuff to him?

A. I don't know if it was that exact date, it might have been like the day after.

Q. All right, did you ever indicate to him that you were not going to give his stuff back?

A. No.

Q. As far as when it was turned over to him, were you getting your threats at that particular point, these threatening text messages; or was that after the fact?

A. I think the threats came after.

Q. Right, so you basically were asked after this break up by [Appellant], "Can I get my stuff back" and what you did is the day after your mom took his stuff back to him, correct?

A. Yeah.

Q. Did you go  with your mom to do that?

A. What?

Q. Did you go with your mom to do that?

A. No.

Q. So, when your mom came back did she tell you that she had dropped the stuff off to [Appellant]?

A. Yeah.

Q. So at this particular point there had not been any threats yet, correct?

A. Not yet.

The military judge later clarified AL's testimony by referencing AL to the text messages:

Q. You just testified this morning that you thought it was maybe the day after you received the text about him wanting his stuff back that your mom returned it.

17

A. Yeah, but I think we were like out of town. I think we were in Bismarck and I don't know exactly when she brought it back. I just know it was like not that long after these.

Q. You mentioned; did you collect the things for your mom to give them back to him?

A. Yeah.

Q. Like you got the bag?

A. Yeah, they were just already in a bag.

Q. What was in the bag?

A. Social Security card, birth certificate, and his car keys.

Q. What about the ring? Did you return the ring at that time?

A. No. I think we like couldn't find it or something. I am not sure, but it wasn't given back at that time.

Q. Were you aware of anything else that you had that he might have wanted from you?

A. Um, I guess the pipes and the bongs he bought me.

Q. Were you aware of anyone else wanting something back from you around this time period?

A. No.

ML testified about "an incident where [her] house was broken into" sometime in mid-December 2013. ML described going home from work around lunchtime and "notic[ing] immediately that the door that we have to the basement was open which is normally closed." ML explained: "So as I walked farther into the entryway I could see upstairs and A[L]'s bedroom door was open, which is never open. And then another bedroom door was open that is up there, and then I thought 'somebody has been in the house.'"

ML confirmed that none of her family members had been in the house. Afterwards, ML went upstairs and looked around the house. ML observed that "[n]othing looked like it had been touched," so she went into the basement. ML felt a draft on her way to the basement and noticed the curtains on the basement window were "blowing." As she got closer, she observed glass on the floor and that the window had been broken. ML described the window as large with a plastic covering. ML further described the plastic being "ripped away" when "they had kicked the window." ML explained it was "unusual" for AL's bedroom door be open because "[AL] always keeps her bedroom door shut. In fact we keep a lot of the doors shut because we have cats, and we just like to keep them out of there because of her allergies and stuff. So, but her

bedroom door is always shut anyway, usually." ML also confirmed that no property was missing. On cross-examination, ML testified about the size of the hole in the window, claiming "An adult male, I guess I just thought about [Appellant] would fit through it. I know we had speculated that maybe he had somebody with [him] or something like that." ML did not see Appellant at or near her home that day.

MB testified that he and Appellant discussed Appellant's pending charges while they were confined together. On direct examination, MB relevantly recounted conversations concerning AL as follows:

> Q. Let's talk about [AL]. What do you remember him saying about [AL]?
>
> A. I guess it was his ex-girlfriend, and I guess they had a break up and he was missing some documents and some things from his place, and pretty much she was the reason why he was in pretrial.
>
> . . . .
>
> Q. I want to bring your attention back to [AL]. Did the accused ever mention anything about her home, about breaking into her home?
>
> A. He personally said he had nothing to do with it but one of his friends or the number 2 in control, [C], and some guys went over there looking for his stuff. It was never mentioned if any harm was done to her or if she was there, or anything, or if they found anything.
>
> Q. When you said number 2 in control or his friend, what did you mean?
>
> A. I guess with the whole he's a Crip, he's number 2 in his chain of command.
>
> Q. What did you understand a Crip to mean?
>
> A. A gang member.

The military judge also considered an audio-recording of Appellant in pretrial confinement making the following statement: "Oh, Amity helped rob [AL's] house; she drove all the way to Berthold to do it." KW testified that a "girl" with the first name "Amity" lived with Appellant.

Appellant argues that "the Government failed to prove that anyone entered the dwelling house of ML," and "[m]oreover, even if the evidence—viewed in a light most favorable to the Government—demonstrates that

someone did enter ML's home, there is no proof that the person was Appellant or someone he instructed to carry out the crime."

It is apparent from the record, Appellant was convicted of this offense as a principal. *See* Article 77, UCMJ, 10 U.S.C. § 877; *see also* R.C.M. 307, Discussion (H)(i) ("All principals are charged as if each was the perpetrator."). A reasonable factfinder could find likewise. The evidence and all reasonable inferences—when viewed and drawn in a light most favorable to the Prosecution—establish Appellant's motivation for unlawfully entering ML's home, his intent to do so, and his ability and willingness to command his gang members to do so. The evidence also suggests that someone broke ML's basement window causing a hole large enough for a person to enter the home and that Appellant admitted a known associate of his, Amity, "helped rob [AL's] house [and] drove all the way to Berthold to do it." Accordingly, Appellant's conviction of unlawful entry is legally sufficient.

However, we have taken a "fresh, impartial look" at the evidence of this offense and are not convinced *beyond a reasonable doubt* that Appellant is guilty of the offense of unlawful entry. While the evidence establishes the legal sufficiency of Appellant's conviction, it also raises several possibilities inconsistent with Appellant's guilt: that someone other than Appellant's gang members entered the house on the occasion ML described; that if members of Appellant's gang did go, it was without Appellant's involvement; or that no *entry* actually occurred. Therefore, we set aside Appellant's conviction of unlawful entry and dismiss with prejudice Specification 4 of Charge VII.

### 7. Distribution of "Mushrooms" on Divers Occasions[8]

The military judge convicted Appellant of distributing some amount of psilocybin, "mushrooms," on divers occasions.

KW lived with Appellant for a period of time. She testified, among other things, about receiving mushrooms from Appellant at least five times. She described eating small mushrooms that made her feel "crazy, hallucinations."

AL testified about seeing Appellant provide mushrooms to GB. AL described Appellant declaring, "Hey, I have some mushrooms," possessing "three little chocolate mushrooms," splitting one with GB, and eating a piece with GB. AL recounted Appellant's reaction to the drug, "He was just saying like that me and [GB] were like witches and that he was scared of us . . . ." Appellant text messaged AL about this incident, stating, "Outside I thought I

---

[8] Raised pursuant to *Grostefon,* 12 M.J. 431.

was in a forest and you two witches were trying to eat me." On cross-examination, AL further discussed the mushrooms:

> Q. Okay. Now let's talk about those mushrooms that you are saying were ingested. Did you ingest any of those?
>
> A. Once, yeah.
>
> Q. Okay and what did they look like?
>
> A. It was a small circular chocolate, with like, you could see like pieces of shrooms, like in it.
>
> Q. Okay and shrooms meaning mushrooms?
>
> A. Yeah.
>
> Q. Now had you been drinking also?
>
> A. No.
>
> Q. Is this the time you say you saw Captain Brown use mushrooms?
>
> A. No.
>
> Q. A different time?
>
> A. Yeah.
>
> Q. When you say you saw him use mushrooms, it was just a totally different occasion? What did they look like if you saw them?
>
> A. Same thing.

During her testimony, GB recounted an incident almost identical to that described by AL. GB described Appellant providing her a mushroom "wrapped in chocolate" when she visited Appellant with AL. GB also described Appellant looking at her and saying "he felt like he was in a forest or something and there was a witch." GB admitted to eating one of the mushrooms Appellant provided, not feeling its effects, and leaving Appellant's house for approximately an hour. GB's testimony on direct examination continued, in pertinent part:

> Q. What happened after an hour?
>
> A. I had left his house, went over to another one of my friend's house and then I went back to his house and I eventually ate *another* half of one, and then I had gone to Walmart with [AL], and um, the way it hits you is like say if you go to the bathroom for example, which was what I did, it hit me like when I was in the bathroom stall.

Q. What kind of effects did you feel from it?

A. I felt really kind of like woozy and happy and not like. . . I kind of felt like I was floating in a way, like everything was really vibrant and people were staring at me. (Emphasis added).

Appellant discussed mushrooms and his distribution to GB in a conversation with other confinees that was recorded by investigators:

[Appellant:] "Luckily there was never any pictures taken of the f[***]ing huge bag of shrooms that I had. I had shrooms with huge f[***]ing mushrooms caps and s[**]t."

. . . .

[Appellant:] "No. I got [GB] f[***]ed up on shrooms at Walmart once. She ended up getting arrested like a couple of hours later. She was f[***]ed up. That was her first time taking shrooms.

Appellant asserts that his conviction for distributing mushrooms "on divers occasions" is legally and factually insufficient. He acknowledges that "[v]arious sources indicate that Appellant provided mushrooms to GB on one occasion." However, Appellant believes "the military judge convicted [him] based on either a misunderstanding regarding the sole distribution or her belief in KW's testimony." Accordingly, Appellant renews his unavailing claim that "[a]s a whole, KW's testimony is too riddled with inconsistencies to prove any offense beyond a reasonable doubt. A reasonable factfinder would disregard her testimony in its entirety . . . ."

Even if a reasonable factfinder disregarded KW's testimony about Appellant's distribution of mushrooms to her, a reasonable factfinder could have nonetheless convicted Appellant of distribution of mushrooms on divers occasions. Appellant concedes one distribution to GB. When viewing the evidence and all reasonable inferences in a light most favorable to the prosecution, a reasonable factfinder could have also found beyond a reasonable doubt that Appellant distributed mushrooms to AL, *and* when GB returned to his house after leaving for approximately on hour and ate another half of a mushroom, Appellant made a second, separate distribution to GB. Unfortunately for Appellant, the military judge, as a reasonable factfinder may have properly believed KW's testimony regarding Appellant's mushroom distribution despite her findings on other charged misconduct. Accordingly, we answer the question of whether a reasonable factfinder hearing the evidence of Appellant's mushroom distribution one way could have found Appellant guilty of distributing mushrooms on divers occasions in the affirmative; Appellant's conviction is legally sufficient. Moreover, like the military judge, we are convinced beyond a reasonable doubt that Appellant distributed mushrooms on two or more occasions; Appellant's conviction is factually sufficient.

**B. Discovery**[9]

Appellant asserts a discovery violation regarding one of the witnesses, AB DE, who testified against him. AB DE joined the Air Force in 2010. Approximately two years later in 2012, he met Appellant in Minot, North Dakota. AB DE and Appellant had a mutual friend and AB DE would frequently "hang out" with Appellant.

In May 2012, AB DE was detained at a local Walmart for shoplifting. The responding officer asked AB DE about his age. AB DE replied that he was 18 years old. After the officer continued his efforts to confirm AB DE's identity and age, AB DE informed the officer that he was actually 20 years old and had provided the wrong birth date earlier. AB DE was arrested for shoplifting and providing false information. AB DE was ordered to appear in local court a few days later for the charge of false information; however, the charge was dismissed by the county's prosecuting attorney because the "AF is taking [jurisdiction]."

In 2013, AB DE was under investigation by military authorities for marijuana distribution and steroid use. Appellant was also under investigation at the time. AB DE and Appellant discussed their investigations. AB DE was ultimately convicted at a court-martial for marijuana distribution and steroid use. During the investigation into his offenses, AB DE lied under oath to investigators. His sentence included 32 months of confinement and a bad-conduct discharge. AB DE and Appellant were reunited in the Minot AFB confinement facility, where AB DE starting serving his post-trial confinement on 13 February 2014 and Appellant was ordered into pretrial confinement. While in confinement, the two talked about their cases daily.

The Government requested and obtained records of AB DE's 2012 arrest for shoplifting and providing false information prior to Appellant's trial defense counsel's specific requests for such information. However, the Government failed to provide this previously-obtained material to the Defense in response to their request.

Appellant argues that the trial counsel's failure to disclose this information about AB DE's arrest for false information resulted in an unfair trial "because it would have significantly strengthened the defense's argument that [AB] DE lied to advance his own interests; DE not only lied to Air Force Authorities on one occasion, he lied to civilian law enforcement on [a] separate occasion and thus could be said to routinely lie."

---

[9] Raised pursuant to *Grostefon,* 12 M.J. 431.

Trial counsel's failure to disclose evidence that is favorable to the defense on the issue of guilt or sentencing violates an accused's right to due process. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "A military accused also has the right to obtain favorable evidence under Article 46, UCMJ . . . as implemented by [R.C.M.] 701–703." *United States v. Coleman*, 72 M.J. 184, 186–87 (C.A.A.F. 2013). Accordingly, Article 46 and these implementing rules provide a military accused statutory discovery rights that are greater than those afforded by the Constitution. *See id.* at 187; *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004).

Consequently, there are two categories of disclosure error: (1) cases in which the defense made no discovery request or merely a general request for discovery, and (2) cases in which the defense specifically requested the information. *Coleman*, 72 M.J. at 187 (citing *Roberts*, 59 M.J. at 326–27). The harmless error standard of review—"whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different"—applies to the first category. *Id.* (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)). The heightened constitutional harmless beyond a reasonable doubt standard applies to the second category. *Id.* "Failing to disclose requested material favorable to the defense is not harmless beyond a reasonable doubt if the undisclosed evidence might have affected the outcome of the trial." *Id.*

In reviewing discovery matters, we conduct the following two-step analysis: "first, we determine whether the information or evidence at issue was subject to disclosure or discovery; second, if there was nondisclosure of such information, we test the effect of that nondisclosure on [Appellant's] trial." *Id.* (quoting *Roberts*, 59 M.J. at 325).

Using this analytical framework, we first quickly conclude—and the Government concedes—that the material pertaining to AB DE's 2012 arrest for shoplifting and false information was not only subject to disclosure by the Government, but that the Government was indeed obligated to provide such information to the Defense.

In testing the effect of this nondisclosure on Appellant's trial, we apply the harmless beyond a reasonable doubt standard. AB DE provided testimony regarding several of the charged offenses; however, most of his testimony was corroborated by other evidence, to include Appellant's statements. On direct examination, AB DE described some of his own misconduct, including buying drugs from Appellant's roommate, and he explained how he was convicted by a court-martial for distribution of marijuana and steroid use and consequently sentenced to confinement. AB DE's cross-examination by Appellant's civilian defense counsel began as follows:

Q. [AB DE], what were you actually convicted of in your court-martial?

A. Distribution of marijuana and use of steroids.

Q. What were you sentenced to?

A. Thirty-two months.

Q. How much time do you have left at this point?

A. A little over a year.

Q. When was your action taken, do you know?

A. When was I sentenced?

Q. No, when did the general sign off on your conviction?

A. I don't know.

Q. You don't know that?

A. No, sir.

Q. And you were given what type of a discharge?

A. A BCD.

Q. A BCD?

A. Yes, sir.

The cross-examination also notably included the following:

Q. Now, when were there discussions between you and [ET][10] about the fact that information from [Appellant] could be helpful to people in confinement? When was that discussion?

A. What do you mean?

Q. There was discussion between [ET] and other people to the effect that [Appellant] was basically a Captain facing charges, and information about him could help people that were in a post-trial or pretrial confinement situation, was there not?

A. Yes.

. . . .

---

[10] ET was another Airman confined with Appellant during Appellant's pretrial confinement at Minot AFB.

Q. What was that conversation about?

A. Just the fact that it had to do with helping us out for doing the right thing.

Q. And helping us out, meaning the other people, other than the accused, correct?

A. Right.

Q. By getting all their sentences reduced, correct?

A. Correct.

. . . .

Q. Once the knowledge came out amongst you and the other people that the monitoring devices were there were there discussions about trying to get the accused to talk about what he was in there for?

A. Not that I know of.

Q. You did not have that conversation with [ET]?

A. Not that I know of, not that I can remember.

Q. Not that you can remember; did you hear the other people that were in confinement with you talking about that?

A. The only thing they talked about was the fact they were going to try to get less time for what he had told them.

AB DE's cross-examination concluded as follows:

Q. When you came into the Air Force, as you have indicated, you had never used drugs before, correct?

A. Yes, sir.

. . . .

Q. And then you get involved with drugs, using and possessing, and distributing drugs, correct?

A. Yes, sir.

Q. Extensively involved, correct?

A. Not extensively.

Q. Well involved enough that you went to a court-martial over it, correct?

A. Yes, sir.

Q. What was the amount of marijuana you had?

A. Thirteen point eight ounces.

Q. What is the street value of that?

A. Five thousand dollars.

Q. Five thousand dollars?

A. Somewhere around there.

Q. Okay, so you were somewhat involved in marijuana?

A. Yes, sir.

Q. Correct; and then when you were contacted by OSI, you were questioned and you flat-out lied to OSI, correct?

A. Correct.

Q. And you knew you were under oath, correct?

A. Yes, sir.

Q. And the reason you lied was because you thought it was to your advantage to do so, correct?

A. Yes, sir.

Q. And you lied with the specific intention to deceive the people that you were talking to, correct?

A. Yes, sir.

CDC: Nothing further. Thank you.

There was no redirect examination and the prosecution rested immediately after AB DE was excused.

At trial, AB DE's credibility was directly challenged and his motives to fabricate revealed. AB DE was shown to be a convicted drug distributor, convicted drug user, and admitted self-serving liar. AB DE also acknowledged the potential for receiving some form of "help" in exchange for providing incriminating information against Appellant. These matters impacting AB DE's credibility would have been self-evident to the military judge. Accordingly, we have no doubt that confronting AB DE with his lie to police about being 18 rather than 20 years old immediately after his arrest for shoplifting at Walmart over two years prior to Appellant's trial would not have affected the outcome of Appellant's case. While the conduct of the prosecution in not disclosing the 2012 arrest material "was, at a minimum, negligent, and certainly violated *Brady*, Article 46, and R.C.M. 701–703, the Government has estab-

lished that under the circumstances of this case its failure was harmless beyond a reasonable doubt." *Coleman*, 72 M.J. at 189.

## C. Ineffective Assistance of Counsel[11]

In general, Appellant alleges his civilian and military trial defense counsel (1) "failed to adequately challenge the testimony of key witnesses despite possessing evidence that these witnesses previously made contradictory statements—some of which were sworn"; (2) "failed to object to material evidence offered by the Government, or move to include exculpatory evidence"; and (3) "failed to properly investigate the case and compile favorable evidence that was easily accessible through [the Freedom of Information Act]." Appellant consequently concludes "[d]efense counsel's performance was deficient and significantly prejudiced Appellant."[12]

In support of his complaints against his trial defense counsel, Appellant submitted several declarations and documents for our consideration. Accordingly, we ordered and received declarations from his trial defense counsel in response.

The Sixth Amendment guarantees Appellant the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)).

Accordingly, as a general matter we "will not second-guess the strategic or tactical decisions made at trial by defense counsel." *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009). When Appellant "attacks the trial strategy or tactics of the defense counsel, [he] must show specific defects in counsel's performance that were 'unreasonable under prevailing professional norms.'" *Id.* (quoting *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006)). We review allegations of ineffective assistance of counsel de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza,* 67 M.J. at 474).

---

[11] Raised pursuant to *Grostefon,* 12 M.J. 431.

[12] In addition to the specific claims addressed in this opinion, we considered all other ineffective assistance of counsel issues raised by Appellant in his declarations and briefs pursuant to *Grostefon*, 12 M.J. 431. We reject those remaining issues as they require no additional analysis nor warrant relief. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Gooch*, 69 M.J. at 362 (citing *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

We review allegations of ineffective assistance of counsel de novo. *Id.* (citing *Mazza,* 67 M.J. at 474).

**1. Failure to Adequately Confront Witnesses**

Appellant claims his defense counsel "failed to challenge numerous witnesses on previous inconsistencies or motive to lie." Appellant then compiles a "list of these inconsistencies or motives to lie that were not addressed by defense counsel during cross-examination or elsewhere." This list includes Appellant's complaints with the testimony of KW, AL, JG, AB DE, and SA NP.

Appellant argues that "KW was the Government's first and arguably most important witness." Appellant maintains that his civilian defense counsel failed to confront KW with "at least three contradictory, sworn statements to investigators." Accordingly, Appellant identifies the following portions of KW's testimony: (1) she "woke up to [Appellant] ejaculating on [her] . . . stomach, and there was some inside [her]"; (2) she denied having previously experienced "black-outs"; and (3) she "only saw two exchanges of money between the Appellant and other individuals regarding Appellant's arranging for prostitution." Appellant contends that his civilian defense counsel should have confronted KW's testimony on these three points with the following statements KW previously made to investigators: (1) "I don't remember all that night tell [sic] I woke up to him on top of me cumming inside of me"; (2) "I had a lot of mornings where I would wake up half naked and not know what happened with a random guy next to me . . . . I started having my friends stay the night with me to watch me and they would tell me I disappeared for a while"; and (3) "I had a lot of mornings where I would wake up half naked and not know what happened with a random guy next to me. I watched most of the guys give [Appellant] money." Appellant also argues that

his defense counsel should have elicited testimony from KW regarding KW's statement that "Appellant got FT pregnant and that [FT] went to Fargo to get an abortion" because the Fargo clinic—the only abortion clinic in North Dakota—"indicated that they did not have any records indicating FT visited the clinic."

While acknowledging that "some of the allegations made by KW did not result in a guilty verdict for certain charged offenses," Appellant maintains KW's "overall credibility was crucial to the Government's case." According to Appellant, "[t]he significance of KW's testimony on the Government's case is evidenced in the closing argument of trial counsel, who referenced KW approximately 40 times." Therefore, Appellant concludes, "had [trial defense counsel] adequately cross-examined KW, the military judge would have given her testimony little weight."

In response, Appellant's trial defense counsel explained that they made the tactical decision not to cross-examine KW with the specific statements identified by Appellant because they wanted to (1) show Appellant did not penetrate KW's vulva; (2) "demonstrate KW was not intoxicated or drugged during the sexual encounter"; and (3) not introduce evidence of "other times [KW] saw [Appellant] receive money for having sex with her." Cross-examining KW with the statements offered by Appellant would have, in trial defense counsel's estimation, defeated those purposes. With respect to KW's statement about FT's abortion, the trial defense counsel assert that KW "did not have any personal knowledge about the purported abortion but had heard it from someone else."

Appellant next directs his allegations towards the testimony of AL, during which she testified to being in a "relationship" with Appellant. Appellant believes his trial defense counsel should have confronted AL with a previous statement in which she "denied any romantic or sexual involvement with Appellant" and evidence suggesting "[Appellant] was dating [AL]."

Appellant's trial defense counsel explained that evidence suggesting Appellant, a commissioned officer who was then 27 years old, was in a romantic relationship with the 16–17-year-old AL, and seemingly pressuring AL into sexual encounters with him in exchange for marijuana, would have been "quite devastating" to Appellant's case.

Appellant contends that his trial defense counsel should have cross-examined JG and AB DE about their clemency requests. Consequently, Appellant maintains "defense counsel never addressed the fact that both JG and AB DE had a motive to lie about Appellant: they were seeking clemency from their respective court-martial sentences."

Appellant's trial defense counsel responded to this assertion as well. Appellant's trial defense counsel explained that JG provided favorable evidence to the Defense and there was no need to establish any motive for JG to lie. Defense counsel further explained that establishing a motive to lie for AB DE would have opened the door for the admission of a prior consistent statement that would have more damning that AB DE's testimony. Consequently, trial defense counsel decided not to cross-examine these witnesses about their post-trial clemency requests.

Appellant finally claims that trial defense counsel "actually hurt [his] case during his cross-examination of SA NP by introducing ET's work as a confidential source *after* the investigation against Appellant." (Emphasis in original). Appellant describes evidence from his Article 32, UCMJ, hearing that indicates ET "worked as a registered OSI source . . . just a short time prior to gathering information on Appellant." Without further explanation, Appellant asserts "this was a significant fact that the military judge should have considered, as it calls into question the motive of both ET and the investigators, and would likely have led to an analysis of whether the Government deliberately elicited statements from Appellant after his Sixth Amendment right to counsel had attached." Appellant then concludes, again without further analysis, that there "is a reasonable probability that this analysis would have limited at least portions of the audio recording from being admitted into evidence."

ET did not testify, yet Appellant's trial defense counsel was able to challenge ET's motives and credibility through SA NP's cross-examination. Furthermore, Appellant's trial defense counsel declared "the confinement recordings demonstrate that there was no good faith argument [Appellant] was being interrogated about charged offenses by an informant after invoking his rights to counsel."

Although Appellant identified what he believes to be specific defects in his counsel's confrontation of certain witnesses, he failed to show that his counsel's decisions were unreasonable. Accordingly, we find no reason to second-guess the sound decisions Appellant's counsel made with regard to cross-examining the witnesses identified by Appellant. The trial defense counsel's well-reasoned and extensive cross-examination of KW resulted in Appellant being acquitted of several serious offenses—to include the sexual offenses against KW. Moreover, trial defense counsels' decision not to confront AL about the nature of Appellant's "relationship" with AL was reasonably intended to prevent more evidence about Appellant's sordid relationships with teenage girls from being offered against him. Appellant's counsel made similarly sound decisions in not cross-examining JG and AB DE about their clemency requests; trial defense counsel reasonably sought to avoid impeaching a

favorable witness and to prevent prior consistent statements from being offered against Appellant. Likewise, Appellant's counsel reasonably determined that the timing of ET's service as an informant did not impact the credibility of witnesses nor did it give it rise to a good faith claim that Appellant's Sixth Amendment right to counsel had been violated in any way. Such decisions and conclusions, under the facts of this case, can hardly be found to fall measurably below the performance ordinarily expected of fallible lawyers. Even if trial defense counsel's decisions can be considered ineffective, we find no reasonable probability that, had these witnesses been confronted as proposed by Appellant, there would have been a different, more favorable result for Appellant at trial. Appellant failed to establish his counsel were ineffective in confronting KW, AL, JG, AB DE, and SA NP.

### 2. Failure to Object or Offer Exculpatory Evidence

Appellant also alleges that his counsel "were deficient in their handling of key exhibits." To support this allegation, Appellant argues that his counsel's "loss of [a disk containing hundreds of pictures and texts between AL and Appellant] and subsequent failure to require the text messages be admitted in their entirety prevented the military judge from accurately assessing AL's credibility."

In response to this allegation, Appellant's counsel both maintained that the disk was thoroughly reviewed and the evidence never "lost" as a copy could be obtained from the Government. Moreover, Appellant's counsel agreed that offering the text messages in their entirety would, apart from potentially showing Appellant and AL were in more than a "relationship" as AL testified, and would "not paint [Appellant] in a positive light." According to Appellant's counsel, these text messages would once again show Appellant, a 27-year-old commissioned officer, in relationship with a 16–17-year-old girl— a relationship in which he discussed giving her drugs seemingly in exchange for romantic encounters. The trial defense counsel explained that they "had the disc when AL testified but made a strategic decision not to use it because the texts were so harmful to [Appellant]."

Appellant further alleges that "[d]efense counsel similarly failed to require the audio recordings from the confinement facility be admitted in their entirety." Appellant surmises,

> Had they done so, the military judge would have been able to see how much the other inmates prodded Appellant for information. She also would have been able to compare the Government's cherry-picked statements with the full scope of Appellant's conversations over a two-week period. Additionally, the military judge would have heard Appellant deny having sex

> with GB, deny knowing FT's age, and been able to generally
> gauge how much exaggeration and bravado inmates engaged in
> while confined.

Appellant's counsel describe the confinement recordings as "[o]ne of the most significant problems [they] faced in the case." Appellant explained to his counsel that he engaged in these discussions because "he was trying to impress the junior enlisted personnel he was confined with." Both trial defense counsel concluded the recordings were extremely prejudicial to Appellant—for example, Appellant initiated conversations about his misconduct; detailed his own criminal misconduct; "utilized gang and racial terminology"; used inappropriate language with junior enlisted personnel; "name-called" his leadership and the legal office; referred to witnesses as "b[****]es"; stated his first sergeant was a "d[***]head who didn't do s[**]t for him"; talked "about wanting to become an attorney so he could represent organized crime an[d] make a lot of money"; and "discussed prior allegations for which he received nonjudicial punishment for which the Government never found all of the evidence against him." According to Appellant's counsel, the aforementioned examples are "just a sample of the hours of similar conversations." Consequently, trial defense counsel merely wanted to provide context to the limited conversations offered by the Government. Trial defense counsel explained that they wanted to show that Appellant's statements in the Government's exhibit "were just bravado and not true admissions of guilt." Trial defense counsel further explained their decision not to play any more of the confinement recordings "as a strategic decision based on what [they] believe was in [Appellant's] best interest."

Finally, Appellant claims that his trial defense counsel were deficient in requesting the military judge take judicial notice of the distance between Fargo, North Dakota, and Minot, North Dakota, rather than Fargo and Berthold, North Dakota, which Appellant states is 24 miles farther west. Appellant concludes that his counsel "should have recognized the difference . . . and understood that driving farther from Fargo would provide a better alibi" to the unlawful entry offense.

In response to this claim, Appellant's counsel agreed that they did request the military judge take judicial notice of the 300.23 miles. However, Appellant's military defense counsel asserted that Berthold was actually closer and made Appellant's alibi defense more plausible.

We disagree with Appellant and find that his counsel's decisions not to offer the entirety of Appellant's text messages with AL and the entirety of his recorded conversations with enlisted inmates to be more than reasonable given the content of those communications and the general context of Appellant's case. Once again, Appellant's counsel reasonably concluded that evi-

dence revealing the nature of Appellant's relationship with a teenaged girl—that ostensibly included sexual innuendo and drugs—would have damaged, rather than helped, their case. Appellant's counsel likewise soundly assessed the objectively negative impact recordings that captured Appellant, *inter alia*, bragging about his crimes, glorifying a criminal lifestyle, degrading superiors and others, and using racially offensive language would have had on Appellant's defense. Furthermore, we find that Appellant's counsel's request for the military judge to take judicial notice of the distance between Fargo and Minot was reasonable. Accordingly, Appellant failed to show that these strategic evidentiary decisions fell measurably below the performance ordinarily expected of fallible lawyers. Even if trial defense counsel's decisions can be considered ineffective, we find no reasonable probability that had the evidence championed by Appellant been admitted there would have been a different, let alone a more favorable, result for Appellant at trial. Appellant failed to establish his counsel were ineffective in handling these evidentiary matters.

### 3. Failure to Properly Investigate

Lastly, Appellant alleges that his "[d]efense counsel was deficient in compiling favorable evidence for Appellant." Appellant argues that he, "a legal layman, was able to obtain . . . materials through his own initiative and while confined." Appellant lists the "several materials that would have helped Appellant," as follows:

> a. A sexual assault allegation against AC. Included in the file is a transcript of a conversation between Detective MM and KW, regarding the allegation that AC had sex with KW, then a minor. During this conversation, KW denied remembering having sex with AC, her then-fiancé. She later confessed to having sex with him one to five times.
>
> b. Affidavit from TC, a Minot Police officer, describing AL's arrest for marijuana on 24 May 2014. After AL's arrest, she was taken to the Ward County jail where she denied having anything on her person; however, a Corrections Officer found a glass smoking device with burnt marijuana and a baggie of marijuana in her bra.
>
> c. Affidavit of Probable Cause relating to the shoplifting arrest of DE on 7 May 2012. During this arrest, DE lied to law enforcement about his age. The case was later transferred to the Air Force.
>
> d. Administrative segregation documents, dated 25 June 2014. [Staff Sergeant (SSgt)] JO testified that Appellant entered segregation on 20 June 2014 and was only there for "two, maybe

three weeks." [The documents show] that Appellant's segregation began on 6 June 2014 and ended on 20 August 2014; a total of 75 days.

e. KW's Facebook post on 3 June 2013, calling Appellant an "amazing roommate" who knows "how to treat a ladie." [sic]

f. Photos of Appellant's apartment taken by the Minot Police Department.

(Citations omitted).

Appellant then argues that the "records of AC's sexual assault allegation . . . and KW's Facebook posts would have challenged KW's credibility." He maintains that KW lied to law enforcement. Appellant also posits that KW's Facebook posts "contradict[] her testimony that Appellant sexually assaulted her," and when she "moved out" of Appellant's apartment. Appellant continues to support his allegations with the following arguments:

TC's affidavit would have challenged AL's credibility; she lied to [law] enforcement.

DE's shoplifting record would have challenged his credibility; he lied to law enforcement.

. . . .

The administrative segregation documents contradict SSgt JO's testimony and a memorandum he wrote detailing when Appellant entered segregation. The military judge relied on these dates for her ruling regarding illegal pretrial punishment.

. . . .

The photos of Appellant's apartment taken by the Minot Police Department show the bed in the far corner of his room. This would have made it virtually impossible for KW to have witnessed Appellant having sex with GB from the door and in the dark.

(Citations omitted).

Appellant's counsel described their pretrial preparation and related investigation. Appellant's counsel explained their multiple discovery requests with the Government and conducting their own investigation of potential Government witnesses—including searches of court records and social media. However, Appellant's counsel did not discover or obtain the material listed by Appellant.

In response to some of Appellant's specific claims, his counsel maintain that, even if they had the information cited by Appellant, they would not have cross-examined KW about her sexual assault allegations against AC because "AC was an associate of [Appellant] and discussed during the trial as someone who was part of several of the charged events and this records [sic] shows him having sex with underage girls, in which part of the charges against [Appellant] alleged his so-called gang was involved." Appellant's counsel also state that they also would not have cross-examined AL about her marijuana arrest because "it demonstrated that AL was using marijuana, which the Government's evidence demonstrated was coming from [Appellant]." According to Appellant's counsel, KW's Facebook post apparently "came from [Appellant's] Facebook page" and Appellant's counsel asked Appellant's family members for assistance in obtaining information from Appellant's Facebook page.

Appellant's successful efforts in obtaining information about a few witnesses and other material—even while conducted from confinement—do not, per se, render his counsel ineffective for failing to obtain the same information during their pretrial investigation. Indeed, Appellant's trial defense counsel had "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "In considering whether an investigation was thorough, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" *United States v. Akbar*, 74 M.J. 364, 379–80 (C.A.A.F. 2015) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)). Accordingly, we find that trial defense counsel took reasonable efforts to investigate and obtain, through discovery, favorable information in Appellant's case. Their pretrial conduct did not fall measurably below the performance ordinarily expected of fallible lawyers.

Even if Appellant's trial defense counsel were ineffective in uncovering the information obtained by Appellant, we find no reasonable probability that there would have been a different result. First, Appellant was acquitted of the sexual offenses against KW. Second, AC was not a witness at trial and his counsel reasonably would not have cross-examined KW about potential, similar sexual offenses perpetrated by Appellant's associate. Third, AL's credibility was thoroughly examined by trial defense counsel. Additional, less-damaging impeachment would not have changed the outcome of Appellant's case and Appellant has failed to show as much. The information pertaining to AB DE should have be disclosed by the Government, as previously discussed; however, this additional impeachment evidence would not have made a different result reasonably probable. In addition, Appellant testified about the dates he was arguably segregated during pretrial confinement. Therefore, the military judge was able to consider this information in deciding Appellant's

pretrial punishment claims; we find no reasonable probability the "administrative segregation documents" would have changed the military judge's ruling. Finally, the photographs of Appellant's room arguably corroborated portions of KW's testimony and do not create a reasonable probability of a different outcome in Appellant's trial.

Appellant's trial defense counsel were not ineffective in their efforts to uncover favorable information for Appellant. However, assuming Appellant's trial defense counsel were ineffective, we further find no reasonable probability that, even with the information obtained by Appellant, there would have been a different result.

## D. Pretrial Punishment

Appellant was ordered into pretrial confinement at Minot AFB, North Dakota. During an "inspection" of the facility's common sleeping area, military confinement officials, for no articulated reason, ransacked that portion of the facility—throwing and littering the confinees' items throughout the room. At one point, a noncommissioned officer ripped the Velcro rank off of Appellant's parka and threw it across the room. The conduct of these officials was captured on video.

At trial, Appellant claimed he suffered pretrial punishment and requested appropriate sentence relief. After receiving evidence, to include the video recordings of the "inspection," the military judge determined Appellant was entitled to sentencing relief for the unreasonable delays in receiving his mail he experienced while in pretrial confinement. Pertinently, the military judge declined to provide Appellant relief for the conditions of the "inspection," finding, as fact, the following:

> One guard ripped rank off a parka at that time, and threw it, but not away. No evidence provides context for why the guard did that, or why they threw things around during the search. The accused's things were treated the same or better than the other confine[e]s. I do not impute intent to punish based on that search.
>
> . . . .
>
> The accused discussed with [DE] that [he] would try to escape if he got more than six months' confinement. That might suggest that the only escape danger was after court-martial and not before. However, it was reasonable to enforce rules aimed at preventing escape throughout the period of confinement.

On appeal, Appellant maintains that the confinement officials' conduct during the inspection served no legitimate purpose and was punitive in na-

ture. Appellant again asserts he was subjected to illegal pretrial punishment, entitling him to "appropriate sentence relief."

Appellant bears the burden of establishing his entitlement to additional sentence credit due to illegal pretrial punishment under Article 13, UCMJ. *United States v. Mosby*, 56 M.J. 309, 310 (C.A.A.F. 2002).

Article 13, UCMJ, provides:

> No person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances required to insure his presence, but he may be subjected to minor punishment during that period for infractions of discipline.

10 U.S.C. § 813.

The United States Court of Appeals for the Armed Forces (CAAF) outlined the contours of Article 13, UCMJ, as follows:

> Article 13, UCMJ, prohibits two things: (1) the imposition of punishment prior to trial, and (2) conditions of arrest or pretrial confinement that are more rigorous than necessary to ensure the accused's presence for trial. The first prohibition of Article 13 involves a purpose or intent to punish, determined by examining the intent of detention officials or by examining the purposes served by the restriction or condition, and whether such purposes are "reasonably related to a legitimate governmental objective." *Bell [v. Wolfish]*, 441 U.S. [520,] 539 . . . [(1979)]; *[United States v.] McCarthy*, 47 M.J. [162,] 165, 167 [(C.A.A.F. 1997)].
>
> The second prohibition of Article 13 prevents imposing unduly rigorous circumstances during pretrial detention. Conditions that are sufficiently egregious may give rise to a permissive inference that an accused is being punished, or the conditions may be so excessive as to constitute punishment. *McCarthy*, 47 M.J. at 165; *United States v. James*, 28 M.J. 214, 216 (C.M.A. 1989) (conditions that are "arbitrary or purposeless" can be considered to raise an inference of punishment).

*United States v. King*, 61 M.J. 225, 227–28 (C.A.A.F. 2005); *see United States v. Zarbatany*, 70 M.J. 169, 174 (C.A.A.F. 2011).

The primary mechanism for addressing violations of Article 13, UCMJ, is confinement credit. *Zarbatany*, 70 M.J. at 174.

"The question whether appellant is entitled to credit for a violation of Article 13 is a mixed question of fact and law." *Mosby*, 56 M.J. at 310. A military judge's findings of fact, to include a finding of no intent to punish, will not be overturned unless those findings are clearly erroneous. *Id*. "We will review de novo the ultimate question whether [Appellant] is entitled to credit for a violation of Article 13." *Id*.

The military judge's findings of facts are supported by the record and are not clearly erroneous; however, we reach a different answer to the ultimate question of whether Appellant is entitled to credit for a violation of Article 13. In her analysis, the military judge found "that there was no purpose or intent by any governmental authority to punish the accused." After finding unreasonable, excessive delay in screening Appellant's mail, the military judge concluded, "All other actions were reasonably related to a legitimate government objective." But even if this was so—and even absent an intent to punish—the military judge failed to properly consider whether the inspection was sufficiently egregious as to violate Article 13's second prohibition. Although the search or inspection of the confinement sleeping area may have been reasonably related to a legitimate government objective, the military members' behavior in conducting the search was—like the screening of Appellant's mail—excessive. The video recording of the search displays a deplorable disregard of any professional expectation or standard. The noncommissioned officers conducting the search wantonly, and with apparent amusement, ransacked the area, throwing confinees' personal items across the room and on the floor, flipping bed frames, and tearing the rank off of Appellant's parka. Appellant's items were treated with the same disregard as the other confinees. The fact that Appellant was subjected to the same egregious condition as others does not eliminate the excessive nature of the condition. The conditions of this "search" were so excessive as to constitute punishment. Therefore, we find Appellant is entitled to some relief. After considering the nature of the Article 13 violation, to include its relatively short duration, we grant Appellant one week of additional confinement credit.

## E. Post-trial and Appellate Delay

The convening authority took action on Appellant's case 228 days after Appellant's court-martial due to administrative and processing delays. Appellant's record of trial was docketed with this court on 11 August 2015. Appellant's civilian appellate defense counsel requested nine 30-day enlargements of time to file assignments of error. Each of these requests was granted in whole, except for the ninth, which was granted in part.

Convicted Airmen have a due process right to timely review and appeal of courts-martial convictions. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006). In *Moreno,* the CAAF established a presumption of unrea-

sonable post-trial delay that requires a due process review when the convening authority does not take action within 120 days of trial, when a record of trial is not docketed with us within 30 days of the convening authority's action, and when we do not render a decision within 18 months of the case's docketing. *Id.* at 142.

Accordingly, if there is a *Moreno*-based presumption of unreasonable delay or an otherwise facially-unreasonable delay, we are required to conduct a de novo review of Appellant's case to determine whether his due process right to a speedy post-trial review and appeal has been violated. *Id.* at 135. To resolve this question, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135. *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted).

"We analyze each factor and make a determination as to whether that factor favors the Government or the appellant." *Id.* at 136. Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533) ("Courts must still engage in a difficult and sensitive balancing process."). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Although Appellant experienced at least two periods of presumptively unreasonable delay in the post-trial processing and review of his case, he has not claimed any legally cognizable prejudice from the delays, and we find none. Appellant also does not assert that his due process right to timely review and appeal had been violated. After conducting our analysis and balancing of the *Barker* factors, even considering the length and reasons for the delays, we do not find the delays so egregious that tolerating them would adversely affect the public's perception of the fairness and integrity of the military justice system. *See id.* Therefore, we find no due process violation. However, such a finding does not end our review of this matter.

Indeed, Appellant argues that he is entitled to "meaningful relief" in the form of "day-for-day credit for each day over the 120[-day *Moreno*] metric" in accordance with *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002), rather than a due process claim under *Moreno*. *Tardif* permits us to consider wheth-

er we should exercise our power under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to grant relief for excessive post-trial delay. 57 M.J. at 224. In resolving Appellant's request for *Tardif* relief, we are guided by factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), with no single factor being dispositive.[13]

The lengthy post-trial administrative delay between Appellant's case and action is indefensible. *See United States v. Dunbar*, 31 M.J. 70, 73 (C.M.A. 1990). However, after balancing the remaining factors, to include our consideration of the delay attributed to Appellant's civilian appellate counsel, we conclude no extraordinary exercise of our Article 66(c) authority is warranted here. Considered as a whole, Appellant's case has not been subjected to excessive delay, and we discern no particular harm to Appellant. The delays have not lessened the disciplinary effect of Appellant's sentence. The delays have not adversely affected our ability to review Appellant's case or grant him relief, if warranted. The circumstances of Appellant's case do not move us to reduce an otherwise appropriate sentence imposed by the military judge and approved by the convening authority.

## F. Sentence Reassessment

Having found Appellant's conviction of unlawful entry factually insufficient, we have to consider whether we can reassess his sentence or whether a sentence rehearing is required.

Indeed, we have "broad discretion" when reassessing sentences. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). The CAAF has repeatedly held that if we "can determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of the prejudicial effects of error . . . ." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). Thus, our

---

[13] These factors include: (1) How long the delay exceeded the standards set forth in *Moreno*; (2) what reasons, if any, the Government set forth for the delay, and whether there is any evidence of bad faith or gross indifference to the overall post-trial processing of this case; (3) keeping in mind that our goal under *Tardif* is not to analyze for prejudice, whether there is nonetheless some evidence of harm (either to the appellant or institutionally) caused by the delay; (4) whether the delay has lessened the disciplinary effect of any particular aspect of the sentence, and whether relief is consistent with the dual goals of justice and good order and discipline; (5) whether there is any evidence of institutional neglect concerning timely post-trial processing, either across the service or at a particular installation; and (6) given the passage of time, whether this court can provide meaningful relief in this particular situation. *Gay*, 74 M.J. at 744.

analysis is based on a totality of the circumstances with consideration of the following factors: dramatic changes in the penalty landscape and exposure; the forum; whether the remaining offenses capture the gravamen of the criminal conduct; whether significant or aggravating circumstances remain admissible and relevant; and whether the remaining offenses are the type that we as appellate judges have experience and familiarity with to reliably determine what sentence would have been imposed at trial. *Winckelmann*, 73 M.J. at 15–16.

Our decision to dismiss Appellant's unlawful entry conviction only changes the punitive landscape of this case by six months of confinement. The remaining sexual, drug, and gang-related offenses capture the gravamen of Appellant's criminal conduct. Moreover, the forum was military judge alone and we are "more likely to be certain of what a military judge would have done." *Id.* at 16. Given our experience and familiarity with sentences appropriate for Appellant's convictions, we are confident that absent any error, the military judge would have sentenced Appellant to at least a dismissal, confinement for 24 years and 9 months, and forfeiture of all pay and allowances. Accordingly, a sentence rehearing in not required.

## III. CONCLUSION

The finding of guilt to Specification 4 of Charge VII is **SET ASIDE** and **DISMISSED WITH PREJUDICE**. The remaining findings and sentence, as reassessed, are correct in law and fact, and are **AFFIRMED**. Article 66(c), UCMJ. Appellant is credited with one week (seven days) of confinement credit for pretrial punishment suffered in violation of Article 13, UCMJ.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court

42